

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARIA ELROD, as Special Administrator )
for the Estate of Kenneth Elrod, Deceased; )
and MARIA ELROD, )            Case No. 06 CV 2505
)
       Plaintiff, )            Judge John W. Darrah
    v. )
)
OFFICER EDWARD YERKE #1105; )
OFFICER ROGELIO PINAL #18921; )
OFFICER RONALD RODRIGUEZ #15347;)
DETECTIVE GILLESPIE #20970; )
DETECTIVE BURKE #20652; )
SGT. CIRONE, Individually; and )
the CITY OF CHICAGO, a Municipal )
Corporation, )
         Defendants. )

## MEMORANDUM OPINION AND ORDER

This Section 1983 case arises out of an altercation between Kenneth Elrod and

Defendant Chicago Police Officers Edward Yerke, Rogelio Pinal and Ronald Rodriguez

at the Magic Touch Lounge in Chicago, Illinois, on April 6, 2006, and Officer Yerke's

subsequent fatal shooting of Elrod and Demetri Centera on April 7, 2006. Before the

Court is Defendants' Motion for Summary Judgment. (Docket No. 142.)

### LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court

must view the evidence in the light most favorable to the non-moving party and draw all

1

reasonable inferences in the non-moving party's favor. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party meets this burden, the non-moving party cannot rest on conclusory pleadings but must "set forth specific facts in affidavits or otherwise to show that there is a genuine issue of material fact that must be decided at trial." *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). That is, the non-moving party must "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## BACKGROUND

The following background facts are derived from the parties' filings required under Local Rule 56.1.[1] Disputes between the parties as to the material facts are either noted and/or addressed in the analysis section below.

---

[1]Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the party contends there is no genuine issue for trial." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to respond to a Rule 56.1 statement results in the court's admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

Chicago Police Officers Pinal, Rodriguez, Yerke and John Becker met at the Magic Touch Lounge, a bar located at 5728 West Belmont in Chicago, Illinois, on the evening of April 6, 2006. (Pltf. Res. to Def. SMF ("Pltf. Res."), ¶ 5.) The officers were off-duty. None of the officers were wearing uniforms, nor did any of them have badges or guns visible. The officers were wearing jeans and t-shirts. (*Id.*) Also present in the Magic Touch Lounge that evening were the owner of the bar, Frank Ciolino, and the bartender, Felicita Ruiz. Yerke, Rodriguez and Pinal are frequent patrons of the bar and friends with Ciolino and Ruiz. (Def. Resp. to Pltf. SMF ("Def. Res."), ¶¶ 34, 35.)

Kenneth Elrod and his real estate agent, Geovanny Tapia, were also in the bar that evening, as were three women (Tracy, Nicole and Margo) and Omar, the husband of one of the women. (Pltf. Res., ¶ 7.)

Officers Yerke, Pinal and Rodriguez had each consumed several beers. Elrod consumed several drinks of Red Bull mixed with alcohol; Tapia drank approximately ten beers and a few shots. (Pltf. Res., ¶¶ 8,9.)

At some point during the course of the evening, Elrod approached the three women, sitting at a table in the bar. (Def. Res. ¶ 1; Pltf. Res., ¶ 11.) Tapia testified that he couldn't hear what the women were saying but that they were laughing. (Def. Res., ¶ 1.) Ciolino and the officers testified, however, that Elrod was using foul language and that the women appeared uncomfortable and afraid of Elrod. (Pltf. Res., ¶¶ 11, 12.) Tapia denied that Elrod was causing any problems or saying rude things to anyone. Tapia went over to Elrod and the women and bought them a drink. (Def. Res., ¶ 2.) The women left the table and joined Yerke, Pinal and Rodriguez at the other end of the bar.

3

At this time, Becker had already left the bar. Yerke, Pinal and Rodriguez testified that the women told them Elrod was talking about how he just got out of prison, that he was a member of the Latin Eagles gang and that he had at least three guns at home. Ciolino also testified that Elrod told him he was just out of prison and takes care of business when he has to. (Pltf. Res., ¶ 13.)

At about 12:30 or 1:00 a.m., Pinal stood up and walked towards Elrod on his way to the restroom when he heard Elrod say to Ruiz that the girls and Ruiz were all bitches. (Pltf. Res., ¶ 14.) Elrod turned to Pinal and said, "[W]hat the fuck [are] you looking at?" (Pltf. Res., ¶ 15.) Pinal responded by telling Elrod to leave the girls alone because they wanted nothing to do with him. Elrod then took off his jacket, folded it and put it down. (*Id.*) Immediately after he put down his jacket, Elrod took a swing at Pinal. Elrod's punch did not hit Pinal's head but instead made contact with Pinal's arm. (Pltf. Res., ¶ 16.)

A fight then broke out. Pinal began punching Elrod, and eventually Elrod fell to the floor. (Pltf. Res., ¶ 17.) Elrod was hit several times in the face. Tapia went over to the fight to check on Elrod, and Pinal hit Tapia. (Def. Res., ¶ 6.) The officers and Ciolino testified that Elrod continued to fight Pinal after he fell to the floor; Elrod tried to get back up and continued to attack Pinal. Ultimately, Elrod was pushed outside of the bar and told to go home. Tapia was concerned because Elrod looked pretty bad after the fight. There was a lot of blood on Elrod's face. Elrod was bleeding from his lip and/or nose and had blood on his face somewhere by his eyes. (Def. Res., ¶¶ 9,10.)

The officers and Ciolino all testified that only Officer Pinal and Omar (the

4

husband of one of the three women) struck Elrod. They testified that Omar threw Elrod into the foyer area of the bar after Elrod continued to attack Pinal. According to the officers and Ciolino, Officers Yerke and Rodriguez went over to break up the fight. However, Tapia testified that two, maybe three, guys punched Elrod four to five times in the face, badly beating Elrod. (Pltf. SMF, ¶¶ 5, 7, 9, 10.)

Further, Tapia testified that once Elrod was outside of the bar, Elrod didn't say anything else. (Pltf. SMF, ¶ 9.) The officers and Ciolino, however, testified that Elrod yelled threats that he (Elrod) would be back, that he was going to come back and kill everybody, and that "they" were all dead. (Def. SMF, ¶ 23).

After these events, Elrod called his wife, Maria Elrod. According to Maria Elrod, Elrod was furious and told her he had been beaten up in a bar. (Pltf. Res., ¶ 24.) When he arrived home, Elrod showed Maria Elrod his injuries. Elrod was upset. Maria Elrod testified that Elrod did not know who had beaten him up and did not mention the police. (Pltf. Res., ¶25.)

Elrod went into the kitchen and retrieved two guns and put them in his waistband. Elrod then left in a white Ford Ranger pickup truck with his friend Demetri Centera. (Pltf. Res., ¶ 27.)

Officer Yerke and Ruiz left the Magic Touch Lounge around closing time at 2:00 a.m. (Pltf. Res., ¶ 28.) Ruiz drove to her home, and both she and Yerke exited the vehicle in which they were driving. Ruiz walked to the front door of her home, and Yerke moved to the driver's seat. (Pltf. Res., ¶ 29.) Yerke and Ruiz saw a small white pickup truck with two people inside drive slowly up the block behind them with its bright

lights on. (Pltf. Res., ¶ 30.)

Once Ruiz was inside her residence, Yerke started to drive home at approximately 2:30 or 3:00 a.m. (Pltf. Res., ¶31; Def. Res., ¶ 22.) Yerke's vehicle was heading eastbound on Belmont Avenue in the inside lane as he approached the intersection of Belmont Avenue and Kilpatrick Avenue, where Yerke stopped at a red light. (Def. Res., ¶ 23; Ptf. Res., ¶ 32.) While stopped at the red light, a white Ford Ranger pickup truck pulled up next to the left of Yerke's vehicle, facing eastbound in the lane for oncoming westbound traffic. (Pltf. Res. ¶, 33.)

Yerke testified as follows. The passenger, Centera, seated in the Ranger, was three or four feet from Yerke. The passenger yelled something at Yerke while making a gang symbol hand gesture with his left hand. The passenger pointed a handgun outside the window at Yerke's face. (Pltf. Res., ¶ 35.) Yerke reached for his weapon and fired at least three shots at the passenger. The passenger slumped forward in his seat. Yerke then saw that the driver of the Ranger was pointing a weapon at him. Yerke continued to fire his weapon until the driver exited the vehicle. At this point, Yerke stopped firing, exited his vehicle and moved to the front of the two parked vehicles. As he did so, Yerke observed the driver of the Ranger was running westbound on Belmont Avenue and then had fallen to the ground approximately one to three seconds later. (Pltf. Res., ¶¶ 37, 38.) The driver was Elrod.

Both Elrod and Centera were fatally shot.

Chicago Police Detectives Daniel Gillespie and William Burke arrived at the home of Maria Elrod at around 8:30 in the morning of April 7, 2006. Maria Elrod found

6

out that her husband was dead from a reporter who had come to her home at approximately 6:50 that morning. The detectives told Maria Elrod that though they knew it was a bad time for her, they wanted her to come down to the Area 5 police station and ask her some questions. Maria Elrod testified that she went willingly to the station with Detectives Gillespie and Burke. (Maria Elrod Dep., p. 137.) Maria Elrod was not handcuffed, arrested or told that she was a suspect. On the way to the station, Gillespie and Burke repeatedly questioned Maria Elrod as to whether her husband was a gang member. (Def. Res., ¶ 47.) Maria wanted her sister, Irma, to accompany her to the police station; but Detectives Burke and Gillespie refused this request. (*Id.*)

Upon arriving at the Area 5 station, Gillespie and Burke took Maria Elrod to an office. Maria Elrod told the detectives the facts set out above, that her husband called her around midnight and told her that he was furious and had been beaten up in a bar; Elrod subsequently arrived home with Centera, retrieved the guns and bullets from the kitchen and then left with Centera in the Ford Ranger. (Pltf. Res, ¶ 47.)

Maria Elrod arrived at the police station at 9:00 in the morning and did not leave until 5:00 p.m. (Def. Res., ¶ 48.) She was never told that she could leave the station; she was never left alone nor advised that she could make a phone call or given *Miranda* warnings. (Def. Res., ¶¶ 50, 52.) When she needed to go to the bathroom, she was escorted to a women's locker room by a female officer, who waited for her until she finished using the bathroom. (Def. Res., ¶ 53.)

During her time at the station, Maria Elrod was questioned on four separate occasions. She was questioned the first two times by Burke and Gillespie. At 1:00 p.m.,

after she requested to be taken home, Defendants started to take her home but, instead, brought her back to the station because the state's attorney wanted to question her. Subsequently, she was questioned a third time by Burke and Gillespie, with an assistant state's attorney, and then a fourth time by Gillespie and an assistant state's attorney. Maria Elrod was told she could leave only after she signed a statement. (Def. Res., ¶¶ 55, 57 58.) While she was at the station, Maria Elrod was upset, tired, exhausted and overwhelmed. (Def. Res., ¶ 49.)

As Maria Elrod was being questioned, Chicago Police Sergeant Samuel Cirone was on duty as the direct supervisor of Gillespie and Burke. Cirone never spoke with Maria Elrod, but Cirone was kept apprised of the investigation as it related to Maria Elrod, including how Burke and Gillespie were handling the investigation. (Def. Res., ¶ 60.)

The Office of Professional Standards subsequently brought charges against Yerke, Rodriguez, and Pinal based on the ocurrence in the bar. Discipline against Pinal, Yerke and Rodriguez was recommended for what occurred in the bar, but no discipline was recommended against Yerke in connection with the shooting. (Yerke Dep., p. 164.)

Maria Elrod, as Special Administrator of the estate of her husband and on her own behalf, filed a fourteen-count Amended Complaint against Yerke, Pinal, Rodriguez, Burke, Gillespie, Cirone and the City of Chicago pursuant to 28 U.S.C. § 1983 and state law. The Amended Complaint alleges the following claims: (1) Yerke, Pinal and Rodriguez used excessive force against Elrod in the Magic Touch Lounge, violating Elrod's rights under the Fourth and Fourteenth Amendments to the United States

Constitution; (2) Yerke and Rodriguez are liable for failing to intervene when unlawful excessive force was being used against Elrod; (3) Yerke's actions at the bar constituted battery; (4) the actions of Yerke and his friends at the bar in beating up Elrod, kicking him out of the bar and taunting him constituted intentional infliction of emotional distress; (5) the excessive force used against Elrod at the bar was the result of a custom, practice and policy of the City of Chicago that Chicago police officers need only flash their badges and/or identify themselves to avoid discipline or arrest, which encourages police officers to believe they will not be disciplined for their conduct; (6) Yerke's shooting of Elrod constituted excessive force; (7) the shooting of Elrod was the result of a custom, practice and policy of the City of Chicago to do a "cursory investigation" and "rubber stamp" as a justified police shooting; (8) Yerke's action caused the wrongful death of Elrod in violation of 740 ILCS 180/1 *et seq.*; (9) Yerke's actions, shooting Elrod, constitute battery under Illinois law; (10) a claim for Elrod's pain and suffering under Illinois's Survival Statute, 755 ILCS 5/27-6; (11) punitive damages against Yerke, Rodriguez and Pinal for intentional, wanton and willful conduct; (12) a claim for *respondeat superior* against the City of Chicago for the actions of Yerke; (13) a mandamus action against the City of Chicago to release Elrod's truck, cell phone and personal items; and (14) a claim for false arrest for the conduct of Burke, Gillespie and Cirone toward Maria Elrod. (First Am. Complt.)

Defendants move for summary judgment on all of Plaintiff's claims.[2]

---

[2]Plaintiff does not oppose Defendants' motion for summary judgment with respect to her claim of intentional infliction of emotional distress (Count IV) and mandamus claim (Count XIII). Instead, Plaintiff moves to voluntarily dismiss these counts from the action. (Pltf. Br. at 14.) Plaintiff's motion is granted, and Counts IV and XIII are hereby dismissed with prejudice.

## ANALYSIS

### *Excessive Force/ Battery*

Defendants contend they are entitled to summary judgment on Maria Elrod's claims of excessive force and battery as to the fight that occurred at the bar (Counts I and III) because the evidence shows that Elrod "instigated" the fight; Pinal struck Elrod only in self-defense and Yerke and Rodriguez never struck Elrod or harmed him in any way. According to Defendants, the excessive force and battery claims against the officers fail because the officers' conduct cannot be considered "unreasonable" under the circumstances.

Claims that law enforcement officers have used excessive force – deadly or not – in the course of a seizure are analyzed under the Fourth Amendment and its "reasonableness" standard. *Abdullahi v. City of Madison*, 423 F.3d 763 (2d. Cir. 2005). The Seventh Circuit has cautioned that summary judgment or judgment as a matter of law in excessive force cases "should be granted sparingly" as the reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002)).

Here, genuine issues of material fact exist as to the events surrounding the fight at the bar. Material issues of fact exist as to the nature of the fight, the duration, who participated in it, and to what extent and how severely Elrod was beaten. Plaintiff has pointed to deposition testimony contrary to Pinal's testimony that he hit Elrod only two times. Ciolino and Tapia both testified that Pinal punched Elrod in the face more than two times. Further, Plaintiff has pointed to deposition testimony sufficient to create a

material factual issue as to whether Pinal used more force than was necessary to defend himself or subdue Elrod. Ruiz and Ciolino both testified that the fight between Pinal and Elrod was taken to the ground, and witnesses testified that Pinal was on top of Elrod. Further, Tapia testified that three men were punching and kicking Elrod, which is sufficient to create a disputed factual issue as to whether Yerke and Rodriguez were participants. Tapia's testimony and other evidence is sufficient to raise a question as to the severity of Elrod's injuries from the barroom fight.[3]

In sum, Plaintiff has come forward with sufficient evidence on summary judgment to create triable issues as to whether Pinal, Yerke and Rodriguez acted unreasonably and used excessive force against Elrod in the bar. Summary judgment as to Counts I and III, accordingly, is denied.

### *Failure to Intervene*

Defendants argue summary judgment should be granted on Count II because Plaintiff cannot establish a claim that Yerke and Rodriguez failed to intervene to prevent the use of excessive force against Elrod. They argue the evidence is insufficient to show that Pinal even used excessive force against Elrod, and there is "no indication" that Yerke and Rodriguez witnessed Pinal use excessive force. Further, they argue the incident happened quickly; therefore, Yerke and Rodriguez had no opportunity to intervene and that Yerke and Rodriguez moved to break up the fight between Pinal and Elrod "as soon

---

[3]Defendants contend the Court should disregard copies of photographs of Elrod Plaintiff submits to show Elrod's injuries because Plaintiff did not provide a proper foundation for the photographs. However, even if the photographs are disregarded, Tapia's testimony as to the severity of Elrod's injuries is sufficient to create a genuine issue of material fact for purposes of summary judgment.

as they could."

However, material issues of fact also exist as to these matters. A law enforcement officer may be liable under Section 1983 for failure to intervene to prevent another law enforcement officer from infringing the constitutional rights of citizens if that officer had reason to know that excessive force was being used and had a realistic opportunity to intervene to prevent the harm from occurring but failed to do so. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (*Yang*). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997). A realistic opportunity to intervene may exist where a non-participating officer could have "called for back-up, called for help, or at least cautioned [the excessive force defendant] to stop." *Yang*, 37 F.3d at 285.

As discussed above, material issues exist as to whether Pinal (and others) used excessive force against Elrod. Further, there is sufficient evidence for a reasonable jury to conclude that Yerke and Rodriguez witnessed Pinal's use of excessive force and had a reasonable opportunity to intervene. Tapia and other witnesses testified that the altercation lasted at least one to two minutes and that a number of men were punching and kicking Elrod and is evidence (albeit disputed) that Yerke and Rodriguez not only knew of the incident but participated in it. Yerke and Rodriguez deny this occurred and maintain that Elrod was belligerent and the aggressor in the fight and that they merely acted to break up the fight and remove Elrod from the bar. However, material issues of

12

fact exist as to what Yerke and Rodriguez observed and what their conduct was in connection with the incident. Material issues exist as to whether Yerke and Rodriguez had reason to know that excessive force was being used against Elrod, had a realistic opportunity to intervene to prevent the harm and failed to do so. Summary judgment as to Count II is denied.

### Officer Yerke's Use of Deadly Force

Defendants move for summary judgment on Counts VI (excessive force based on Yerke's shooting of Elrod), VIII (wrongful death), IX (battery), and X (pain and suffering under Illinois's Survival Statute) on the ground that Yerke's decision to use deadly force in shooting Elrod and Centera was objectively reasonable under the circumstances. Specifically, Defendants argue it was objectively reasonable for Officer Yerke to use deadly force "when confronted with two individuals pointing handguns at him after one of them shouted at him and displayed a gang sign, from a truck that had pulled up next to his car in the wrong lane of traffic at 3:00 in the morning." According to Defendants, the circumstances confronting Yerke also include "the previous incident in the bar, in which a belligerent, intoxicated patron [Elrod] was thrown out and vowed to return and kill everyone inside the bar."

As noted above, the analysis of a law enforcement officer's use of deadly force is measured by the same reasonableness standard applicable in other excessive force cases. *Graham v. Connor*, 490 U.S. 386, 395 (1989). An officer may use deadly force where the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer." *Tennessee v. Garner*, 471 U.S. 1, 3

13

(1985). The Seventh Circuit has noted, however, that an "award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left to testify"; in such circumstances, "a defendant knows that the only person likely to contradict him or her is beyond reach." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

Plaintiff contends genuine issues of material fact exist as to whether Officer Yerke's use of deadly force against Elrod was objectively reasonable. There is sufficient admissible evidence to contradict Yerke's asserted version of facts surrounding the shooting and/or discredit his position that he acted in self defense with respect to his shooting of Elrod.

First, Plaintiff asserts that there is no forensic evidence that either Centera or Elrod ever fired their weapons; whereas, there is forensic evidence to show that Yerke's weapon was fired seven times. (Pltf. Ex. 7). According to Plaintiff, this contradicts Yerke's assertion that Yerke fired in self defense. Plaintiff argues: "it defies credibility that if in fact Elrod and Centera were pointing weapons at Yerke, neither of them were able to fire a single shot before Yerke drew his weapon or while [Yerke] fired seven shots."

Plaintiff also relies on signed witness statements regarding the shooting given to the Office of Professional Standards of the Chicago Police Department, including a statement by Shawn Knight, a college student who happened to be at the scene. (Pltf. Ex. 4.) Knight recounted that after hearing three gunshots, he saw a Hispanic male exit from the driver's side of the white pickup truck and stumble away. Subsequently, Knight saw

Yerke point and fire his gun at Elrod after both men had exited their vehicles and while Elrod's hands were not raised. Plaintiff contends this evidence raises a material issue as to whether Yerke fired at Elrod when Elrod posed no physical threat to Yerke and contradicts Yerke's testimony that Yerke did not fire his weapon after Yerke exited his vehicle. Further, Knight recounted that he did not see that Elrod had a gun. Plaintiff also cites to deposition testimony of William King (Def. Ex. I), the first witness on the scene after the occurrence. King testified that the photographs of Elrod's and Centera's bodies taken by police officials after the shooting did not accurately depict how the bodies were positioned when he arrived on the scene.

In addition, Plaintiff contends various reports regarding the location of the weapons allegedly used by Elrod and Centera undercut Yerke's version of the events. In particular, Plaintiff relies on (1) a photographic log from the Illinois state police indicating that Elrod's and Centera's weapons were found in the rear of the Ranger and on the driver-side floor (Pltf. Ex. 8); (2) a report from a member of the Chicago Fire Department, noting that Centera had a gun under his *left* arm (Pltf. Ex. 9); and (3) a supplementary report from a Chicago police officer, indicating that the officer observed a weapon protruding from under Centera' head (Pltf. 3, p. 1.) According to Plaintiff, all of this evidence suggests that Officer Yerke's version of the events is not credible and is sufficient to give rise to an inference that someone (including possibly Yerke) may have tampered with the scene to conceal the true circumstances surrounding the shooting.

Finally, relying on Tapia's deposition testimony as to the events, Plaintiff disputes Defendants' position that Elrod made threats as he left the vicinity of the Magic

Touch Lounge after the fight.

Defendants dispute Plaintiff's interpretation of the evidence. Defendants point out that Maria Elrod's testimony is undisputed that Elrod and Centera left Elrod's residence that evening in the white Ford Ranger with guns and bullets, Elrod's vowing to get the people who beat him up; and it is undisputed that the Ranger was found pulled in close proximity to Yerke's vehicle on Belmont Avenue, facing into the wrong direction of traffic, as Yerke described. Further, Defendants contend the Court should disregard much of Plaintiff's cited evidence on summary judgment.[4]

However, even if the evidence disputed by Defendants is disregarded, sufficient admissible evidence exists to create material issues of fact as to whether Officer Yerke's shooting of Elrod was reasonable under all of the circumstances. A jury must determine the facts as they relate to the death of Kenneth Elrod, based on the jury's determination of the credibility of Yerke's in-court testimony and all other relevant testimony and physical evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (at the summary judgment stage, a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; rather, the court must construe the evidence in the light most favorable to the non-moving party and decide all factual disputes in favor of the non-moving party).

Summary judgment on Counts VI, VIII, IX (battery), and X is denied.

---

[4]Defendants contend the statements made by witnesses to the Office of Professional Standards are unsworn and that Plaintiff's submitted reports are unauthenticated.

*False Arrest of Maria Elrod*

Defendants contend they are entitled to summary judgment on Maria Elrod's claim in Count XIV that her interrogation at the Area 5 police station constituted a false arrest in violation of her rights under the Fourth Amendment. Defendants contend no seizure under the Fourth Amendment occurred because the facts show that Maria Elrod voluntarily provided information to Defendants, corroborating Elrod's attempt to assassinate Officer Yerke.

The Fourth Amendment protects "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Not all encounters between police and citizens implicate the Fourth Amendment. The Seventh Circuit has identified three categories of police-citizen encounters. The first category is an arrest, for which the Fourth Amendment requires that police have probable cause. The second category is an investigatory stop, for which the officer need have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category "involves no restraint on the person's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning." This is not a seizure within the meaning of the Fourth Amendment. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999) (*Scheets*). Police are entitled to invite witnesses, including suspects, to the police station for questioning. *Hall v. Bates*, 508 F.3d 854, 857 (7th Cir. 2007) (*Hall*).

An objective standard applies to determine into which category an encounter falls,

*i.e.*, whether there is a "seizure," requiring probable cause or reasonable suspicion, or whether the encounter is consensual. *Scheets,* 188 F.3d at 836. An encounter is considered consensual if "a reasonable person would feel free to disregard the police and go about his business." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The determination of whether an encounter is consensual and, thus, falls within the third category is made on the basis of all relevant circumstances; however, the Seventh Circuit has identified the following relevant factors for making the determination as to whether a reasonable person would believe she was free to leave, including "whether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance." *Scheets*, 188 F.3d at 836-37.

Nevertheless, the Seventh Circuit has held that when a suspect does not ask whether he was free to leave, "the inference arises that he does not want to terminate the questioning but instead wants to use the opportunity to deflect the suspicion of the police." *Hall*, 508 F.3d at 857. As the Seventh Circuit acknowledged, the courts have not imposed "a *Miranda*-like rule requiring police whenever they question someone at a police station to advise him that he is not under arrest and is therefore free to leave at any time." *Id.* at 857-58. Rather, the law places the burden on the individual to ask whether he is free to leave rather than require speculation by judges or juries on whether the circumstances of a particular interrogation were so intimidating that the average person,

18

being questioned, would have thought himself under arrest. *Id.* at 858. Even when a suspect claims that she reasonably believed that she was not free to leave, it is the duty of the suspect to ask. Otherwise, "[i]t's as if one were in a room with the door closed and rather than turning the knob one sued for false imprisonment, though in fact the door was not locked." *Id.*

Here, the facts show that the initial encounter between the investigating officers and Maria Elrod was clearly consensual. She testified that she voluntarily went to the station with Burke and Gillespie. However, at some point, Maria Elrod asked to go home; and the parties dispute the circumstances of her continued presence at the station. A genuine issue of material fact exists as to whether a reasonable person in Maria Elrod's position would have believed that she was free to leave the police station at all times during the seven hours she was there under the circumstances and the above-stated applicable, relevant factors. Therefore, Defendants' motion for summary judgment as to Plaintiff's Fourth Amendment claim for false arrest is denied.

### *Qualified Immunity*

Defendants also move for summary judgment on Counts I, II, VI and XIV on the basis of qualified immunity. Under the doctrine of qualified immunity, public officials "performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The test is whether, in light of law existing at the time of the officer's alleged conduct, a reasonable officer would have known that his conduct violated clearly established constitutional rights. *See Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005).

Summary judgment for Defendants is not appropriate on the basis of qualified immunity. The constitutional rights alleged here to have been violated by Officers Pinal, Yerke and Rodriguez were clearly established at the time of the alleged conduct; if the facts are ultimately determined by a jury in Plaintiff's favor, reasonable officers in Pinal's, Yerke's and Rodriguez's positions would have known that their conduct violated clearly established constititutional rights.

### Claims against the City of Chicago

Defendants contend the City of Chicago is entitled to summary judgment on Counts V and VII of the Amended Complaint, alleging claims of municipal liability under Section 1983, because Plaintiff has not demonstrated an underlying constitutional deprivation.[5] However, as determined above, triable issues exist as to whether some or all of the Defendant Officers committed constitutional violations; therefore, summary judgment as to Counts V and VII is denied.

### Punitive Damages/Repondeat Superior

Defendants move for summary judgment on Plaintiff's claims for punitive damages and *respondeat superior* on the basis that summary judgment is warranted on Plaintiff's other substantive claims. However, again, as determined above, summary judgment is not appropriate on Plaintiff's other underlying claims; therefore, summary judgment is denied on Counts XI and XII.

---

[5]In their reply, Defendants withdraw the argument they made in their opening brief that the claims against the City of Chicago also fail because Plaintiff did not adduce evidence in discovery to demonstrate the requisite elements for imposing municipal liability. As Defendants concede, Magistrate Judge Brown issued a ruling in the case, bifurcating Plaintiff's Section 1983 claims against the City and staying discovery on those claims until after discovery and trial on Plaintiff's Section 1983 claims against the defendant officers.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is denied as to Counts I, II, III, V, VI, VII, VIII, IX, X, XI, XII and XIV. Counts IV and XIII are dismissed with prejudice.

Date: August 28, 2009

JOHN W. DARRAH
United States District Court Judge