UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA ELROD, as Special Administrator of the Estate of KENNETH ELROD, deceased; and MARIA ELROD, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 06-CV-2505 |
| v. | ) ) | Judge John W. Darrah |
| OFFICER EDWARD YERKE (#1105); OFFICER ROGELIO PINAL (#18921); OFFICER RONALD RODRIGUEZ (#15347); DETECTIVE DANIEL GILLESPIE (#20970); DETECTIVE WILLIAM BURKE (#20652); and SERGEANT SAMUEL CIRONE, Individually; and the CITY OF CHICAGO, a Municipal Corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Elrod, as administrator of the estate of her deceased husband,

Kenneth Elrod, filed a complaint containing several claims against Defendants Officer

Edward Yerke, Officer Rogelio Pinal, Officer Ronald Rodriguez, Detective Daniel

Gillespie, Detective William Burke, Sergeant Samuel Cirone, and the City of Chicago,

and amended it thereafter. Several of the claims survived Defendants' Motion for

Summary Judgment. After two days of deliberation following a seven-day trial, a jury

returned a verdict in favor of Plaintiff Maria Elrod, as administrator, against two

Defendants: (1) Yerke, for using excessive force by shooting and killing decedent Kenneth Elrod; and (2) Pinal, for using excessive force on decedent Kenneth Elrod by punching him at a bar prior to his death. However, the jury further found in favor of Defendants on all the remaining counts: (1) finding Yerke and Rodriguez did not use excessive force against Elrod at the bar; and (2) finding Yerke and Rodriguez did not fail to intervene at the bar.[1]

Before the Court is Defendants' Motion for Judgment as a Matter of Law or, in the alternative, Motion for a Partial New Trial. Defendants allege Plaintiff failed to meet her burden of proof at trial or, alternatively, that prejudicial errors occurred during the trial, requiring a new trial. Based on the following analysis, Defendants' Motion is denied.

## BACKGROUND

Plaintiff's husband, the decedent, Kenneth Elrod, was involved in an altercation, involving off-duty Chicago police officers, including Pinal and Yerke, at the Magic Touch Lounge in Chicago, Illinois, on the evening of April 6, 2006.

Following the altercation at the bar, at approximately 2:30 a.m. on April 7, 2006, Yerke drove home from the Magic Touch Lounge. Yerke, driving a Hummer SUV, encountered another vehicle to his left as he stopped at a stoplight. The other vehicle, a 2001 white Ford Ranger pickup truck, was facing the same direction as Yerke's vehicle but in the wrong lane of traffic. Yerke testified he saw two men (Elrod and his friend,

---

[1] Plaintiff Maria Elrod also filed claims on her own behalf against the other defendants for false arrest; these are not addressed in Defendants' Motion, as the jury found in favor of Defendants on the false-arrest claims, as well.

Demetri Centera) in the vehicle next to him. Centera, seated in the front passenger seat of the truck, first flashed gang signs at Yerke, then pointed a gun at Yerke. Yerke testified he then drew his own gun from the waistband of his pants and fired it through the open window of his Hummer, striking and killing Centera.[2] Then, Yerke said, while he was still seated in the Hummer, he then shot Kenneth Elrod, who was also pointing a handgun at Yerke, as Elrod was seated in the driver's seat of his Ford truck. Yerke claimed he shot both men in self-defense.

It is undisputed that Elrod then exited his truck and started running away, past the rear of his truck, without a weapon in his hand. Plaintiff argued that Yerke did not fire his weapon only while he was seated in the Hummer, as Yerke testified, but that there was evidence that Yerke got out of his Hummer and fired and shot Elrod after Elrod ran from the Ford truck. Elrod died in the street 30 to 40 feet behind his vehicle, unarmed. Plaintiff claimed that Yerke's use of deadly force was, therefore, excessive.

At the close of Plaintiff's case, Defendants moved for judgment as a matter of law as to all of Plaintiff's claims against all Defendants. This motion was denied. On March 7, 2012, Defendants filed this post-trial motion, seeking to have judgment entered as a matter of law as to those excessive force claims against Yerke and Pinal, pursuant to Fed. R. Civ. P. 50(b) and 59(a)(1)(A), on the basis that Plaintiff failed to meet her burden of proof at trial. In the alternative, Yerke moves for a new trial as to Yerke's use of deadly force, arguing: (1) the Court erroneously excluded evidence at trial, prejudicing Defendants; (2) Defendants were improperly prejudiced by Plaintiff's closing argument

---

[2] The shooting of Demetri Centera was not at issue in this case.

and the Court's rulings on Defendants' objections during her closing; and (3) the jury

verdict was against the weight of the evidence demonstrated at trial. (Defs.' Mot. at 2.)

Pinal also moves for a new trial as to Plaintiff's excessive force claim against him,

arguing the Court erred in excluding evidence at trial, unfairly prejudicing Pinal. (*Id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

In considering a motion for judgment as a matter of law under Rule 50(b), a court views

the evidence and all reasonable inferences in a light most favorable to the party who

prevailed under the verdict. *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 531–32

(7th Cir. 2008) (*Tate*). A verdict is overturned only if "no rational jury could have found

for the plaintiff." *Id.* at 532 (quoting *Waite v. Bd. of Trs.*, 408 F.3d 339, 343 (7th Cir.

2005) (*Waite*)). While a court must consider the evidence presented to determine if it

was sufficient to support a jury's verdict, the court may not "make credibility

determinations or weigh the evidence." *Waite*, 408 F.3d at 343. In ruling on a Rule

50(b) motion, "the question is not whether the jury believed the right people, but only

whether it was presented with a legally sufficient amount of evidence from which it could

reasonably derive its verdict." *Massey v. Blue Cross–Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). Defendants must meet a difficult standard: a jury verdict will be overturned only if it is determined that no rational jury could have found for the non-moving party. *Waite*, 408 F.3d at 343 (citations omitted).

Defendants' motion, in the alternative, for a new trial, is governed by Federal Rule of Civil Procedure 59(a)(1)(a), which provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Succeeding on a Rule 59 motion also requires the movant to meet a particularly difficult standard. A motion for new trial is granted only if the verdict is against the manifest weight of the evidence, the damages are excessive, or other reasons exist as to why the trial was unfair to the moving party. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010). Similar to the Rule 50 standard, a new trial is granted only if 'no rational jury' could have rendered the verdict. *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (citing *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)). A new trial may also be granted if misconduct by opposing counsel prejudiced the adverse party. *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir. 1983).

To obtain a new trial on the grounds of an erroneous evidentiary ruling, the party must show that such a ruling affected his substantial rights. Fed. R. Evid. 103(a). Specifically, an erroneous ruling will only warrant a new trial where the error "had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 440

(7th Cir. 2012) (quoting *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558,

564 (7th Cir. 2006)).

## ANALYSIS

*Judgment as a Matter of Law*

Defendant Yerke argues Plaintiff failed to meet her burden of proof of

preponderance of the evidence regarding the excessive force claim against Yerke.

Specifically, Yerke argues Plaintiff failed to present evidence that Yerke's use of deadly

force against Elrod was excessive. (Defs.' Mot. at 7.) It is undisputed that Yerke shot

and killed Elrod; the only factual issues at trial were where this killing occurred and

under what circumstances.

Excessive force claims are analyzed under an objective reasonableness standard.

*Deering v. Reich,* 183 F.3d 645, 650 (7th Cir. 1999). Yerke's use of deadly force is

unreasonable "only if, 'judging from the totality of circumstances at the time of the

[conduct], the officer used greater force than was reasonably necessary. . . .'" *Gonzalez*

*v. City of Elgin,* 578 F.3d 526, 539 (7th Cir. 2009) (quoting *Lester v. City of Chicago,* 830

F.2d 706, 713 (7th Cir. 1987)). The relevant question in considering an excessive force

claim is whether the totality of the circumstances justified a particular type of force. *See*

*Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "When a jury measures the objective

reasonableness of an officer's action, it must stand in *his* shoes and judge the

reasonableness of his actions based upon the information he possessed and the judgment

he exercised in responding to that situation." *Sherrod v. Berry*, 856 F.2d 802, 804-805

(7th Cir. 1988) (*Sherrod*) (emphasis in original).

At trial, evidence was presented to the jury regarding the altercation that occurred at a bar, the Magic Touch Lounge, in Chicago on April 6, 2006, between Kenneth Elrod and the Defendant officers. While in the bar, Elrod approached some women, who apparently rejected Elrod's advances; this caught the attention of the police officers. A fight broke out at the bar between Elrod and the police officers; Yerke testified that Elrod took a swing at Pinal and that Pinal responded by punching him two or three times. (Trial Tr. 270:22 – 271:20, Jan. 31, 2012.) After the physical confrontation, Yerke escorted Elrod out of the bar. (Trial Tr. 274:3 – 274:21, Jan. 31, 2012.) Elrod's friend, Geovanny Tapia, was with Elrod at the bar and testified that the police officers at the bar continued to punch and kick at Elrod as he left the bar, striking him at least three or four times in the face. (Trial Tr. 209:25 – 211:9, Jan. 31, 2012.)

Elrod went to his home, where he retrieved two guns; he and his friend, Demetri Centera, then left the home in Elrod's white 2001 Ford Ranger pickup truck. (Trial Tr. 753:8 – 756:9, Feb. 6, 2012.)

Yerke testified that he arrived at the bar between 11:00 and 11:30 p.m. on April 6, 2006. (Trial Tr. 254:5 – 254:8, Jan. 31, 2012.) Yerke further testified that after Elrod left the bar around 12:30 a.m., Yerke remained at the bar until it closed, around 2:15 or 2:30 a.m. (Trial Tr. 284:2 – 284:6, Jan. 31, 2012.) During Yerke's approximately three-hour stay at the bar, he testified that he had two or three beers, all consumed prior to the altercation with Elrod around 12:30 a.m.[3] (Trial Tr. 284:15 – 284:17, Jan. 31, 2012.) Yerke left the bar with an employee of the Magic Touch Lounge, Felicia Ruiz. Ruiz

---

[3] However, Yerke was never asked by the police to take a breathalyzer test after the shooting later that morning. (Trial Tr. 312:8 – 312:9, Jan. 31, 2012.)

lived blocks away from the bar, and she drove Yerke's Hummer to her home, where she

exited Yerke's vehicle. (Trial Tr. 284:4 – 286:19, Jan. 31, 2012.)

As summarized above, Yerke testified he then drove away and stopped at an

intersection's red light, where he encountered the white Ford truck to the left of the

driver's side of his Hummer. (Trial. Tr. 287:1 – 287:7, Jan. 31, 2012.) Regarding the

firing of his weapon, a Sig Sauer P239 semiautomatic handgun, Yerke testified

specifically as follows. The passenger in the front passenger seat of the vehicle was

flashing gang signs at him. (*Id.* at 287:7 – 287:17.) Then, the passenger pointed a gun at

Yerke, though the passenger did not fully extend the gun out the window. (*Id.* at 288:12

– 289:9.) Yerke, upon seeing a gun pointed at him, drew his own weapon and shot at the

passenger, Demetri Centera. (*Id.* at 289:10 – 291:18.) After shooting Centera, Yerke

saw a man in the driver's seat of the truck (Elrod), also pointing a gun at Yerke,

whereupon Yerke began firing his gun at Elrod. (*Id.* at 291:19 – 292:22.) Yerke said all

the shots he fired were fired while he was seated in his Hummer. (*Id.*)

Defendants argue, in their motion for a new trial, that Plaintiff did not present any

evidence to contradict Yerke's testimony that he fired at Elrod while Elrod was in the

Ford truck because Elrod was pointing a firearm at him. Defendants are correct that

Yerke was the only witness able to provide a direct account of the shooting.[4]

---

[4] The Court denied Defendants' Motion for Summary Judgment in a
Memorandum Opinion and Order, dated August 28, 2009, on all but two counts of
Plaintiff's First Amended Complaint. The opinion discusses the statements of an eye
witness presented by the Plaintiff whose statement directly contradicts Yerke's
testimony. (*See* Aug. 28, 2009 Memorandum Opinion and Order, pp. 14-15.) This
witness was not produced at trial, and his statement is not considered in any regard in this
opinion.

This does not mean the jury was therefore required to believe Yerke's testimony as to what occurred at the time of the shooting; rather, the jury was directed to consider what weight, if any, Yerke's testimony was to be given. (*See* Jury Instruction No. 10, instructing the jury it was to determine what weight, if any, was to be given to each witness, thereby permitting testimony to be afforded less weight if the jury found it to be contradicted or impeached.) The jury was further instructed to consider all the evidence introduced at trial and make reasonable inferences as to that evidence. (Jury Instruction No. 8.) "It is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony *must* be true." *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994) (emphasis in original). However, the jury could not have found in favor of Plaintiff had the only evidence been its lack of belief in Yerke's account. *Id.* at 746-47.

Defendants' motion ignores other evidence presented to the jury, as well as inferences the jury might have drawn, which were inconsistent with Yerke's claim of self-defense and supported Plaintiff's claim of Yerke's use of excessive force. The jury heard the testimony of William King, who stopped at the scene shortly after the shootings.[5] King observed the position of each body and testified that the crime scene photos taken after King arrived on the scene showed the decedents' bodies in different positions than what he had seen. (Trial Tr. 451:20 – 460:4, Feb. 1, 2012.) King also testified that he did not see the decedents' weapons when he appeared on the scene. (Trial Tr. 455:25 – 456:13, Feb. 1, 2012.)

---

[5] As William King was unavailable, the jury heard excerpts of his deposition.

An investigator of the scene testified to the fact that two guns were found in
Elrod's truck, one in the bed of Elrod's truck and one on the floor of the truck on the
driver's side. (Trial Tr. 427:11 – 428:18, Feb. 1, 2012.) Yerke admitted he did not check
to see if Elrod still had a gun as he lay in the street. (Trial Tr. 352:18 – 352:24, Jan. 31,
2012.) Moreover, the jury learned at trial that the weapon purported to be Elrod's gun
was discovered at the scene without a round in the firing chamber; the weapon would not
have discharged if the trigger was pulled. (Trial Tr. 427:4 – 429:15, Feb. 1, 2012.)
Therefore, the jury might have inferred that Elrod would not have pointed a gun at Yerke
in that condition. *See Sherrod*, 856 F.2d 802, 814 (Judge Flaum, dissenting).

Additionally, King testified when he arrived on the scene, Yerke asked King to
call the police and that Yerke told him that Yerke could not get a signal on his cell phone.
(Trial Tr. 451:11 – 453:24, Feb. 1, 2012.) However, Yerke testified that he was in shock
and that his hands were too shaky to use his phone to call 911. (Trial Tr. 303:6 – 303:14,
Jan. 31, 2012.) Contrary to that statement, Yerke's phone records show that Yerke,
immediately after the shooting, placed multiple phone calls to other police officers,
including those who were with Yerke earlier at the Magic Touch Lounge, as well as his
police partner and Yerke's sergeant. (*Id.* at 303:17 – 305:21.) And, contrary to Yerke's
claim he was too in shock and too shaken to call 911, King testified that Yerke "didn't
show no emotions or nothing to the fact of the accident that took place . . ." and that
Yerke did not seem distressed at all. (Trial Tr. 454:14 – 454:20, Feb. 1, 2012.)

The jury also heard evidence regarding the relative heights of the vehicles; Yerke
testified that he fired downward at the men in the Ford Ranger truck and that the

10

individuals in the truck were possibly a foot lower than he as he was seated in his
Hummer. (Trial Tr. 290:1 – 290:4, 299:17 – 301:21, Feb. 1, 2012.) The jury was also
shown a photo of Elrod's Ford Ranger next to Yerke's Hummer. (Trial Tr. 410:12 –
412:12, Feb. 1, 2012; Defendants' Exhibit 4-25.) This evidence demonstrated the angle
at which Yerke fired his weapon into the lower Ford Ranger truck, particularly as to
Yerke's ability to shoot and strike Elrod in the driver's seat, the side furthest from the
Hummer. The jury could reasonably conclude that Yerke's testimony regarding firing his
weapon, considering this angle, was inconsistent with the location of some of Elrod's
bullet wounds, as described below.

   The number of shots fired was also in question. Yerke testified that he fired a
total of seven shots. (Trial Tr. 292:9 – 292:13, Jan. 31, 2012.) However, a detective who
investigated the shooting testified that a total of nine separate gunshot wounds were
found in the bodies of Elrod and Centera. (Trial Tr. 377:2 – 384:5, Feb. 1, 2012.) Yerke
testified that as he was firing at Elrod, Elrod got out of his vehicle. (Trial Tr. 292:19 –
292:22, Jan. 31, 2012.) Then, Yerke exited his Hummer and crept around the front of
Elrod's vehicle, watching Elrod run approximately forty feet behind his truck. (Trial Tr.
293:22 – 296:19, Jan. 31, 2012.) The jury later learned that Elrod had five gunshot
wounds, including a wound to his middle right flank, another to his upper right shoulder,
and one wound on the inside of his left arm. The jury also learned Elrod was found dead
on the pavement with a gunshot entrance wound to the right side of his head. (Trial Tr.
383:25 – 384:2, Feb. 1, 2012.) Although Yerke testified that he did not continue to shoot
at Elrod once Elrod exited his vehicle, based on the totality of the evidence, a reasonable

11

jury could conclude to the contrary. In particular, the jury could reasonably have concluded that Elrod did not run forty feet from his car to where his body was found after sustaining a gunshot wound to the head while in the Ford pickup truck. The jury could reasonably conclude, therefore, that Yerke, contrary to his testimony, shot and killed Elrod, unarmed, at or near where Elrod's body laid, not in self-defense but by use of excessive force.

All these reasonable inferences must be considered in a light most favorable to Plaintiff in ruling on Defendants' Motion for Judgment as a Matter of Law. *Tate*, 546 F.3d at 531-32. The evidence presented was sufficient for a rational jury to find in favor of Plaintiff. After extensive deliberation,[6] the jury returned a verdict, finding Yerke's use of deadly force excessive. Defendants have failed to show that the jury's verdict here should be overturned and have not demonstrated that no rational jury could have found for the non-moving party. *Waite*, 408 F.3d at 343. Therefore, Defendants' Motion for Judgment as a Matter of Law is denied.

*Motion for a New Trial on Claim of Excessive Force Against Defendant Yerke*

In the alternative, Defendants request a new trial on the deadly force claim against Yerke, arguing the Court erred in barring the testimony of a medical examiner who was not disclosed as an expert witness. Defendants further argue for a new trial as to the deadly force claim against Yerke on the basis that Plaintiff's closing argument unfairly

---

[6] The jury sent the Court a note, indicating that they were at an impasse in their deliberations regarding one of the eight counts at issue. (Trial Tr. 1112:4 – 1112:12, Feb. 9, 2012.) The Court issued an *Allen* charge, repeating Jury Instruction Number 32 and instructed the jury to continue considering the evidence in order to render a verdict. *See United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973).

prejudiced Defendant, and that the jury's verdict was against the weight of the evidence presented at trial.

Undisclosed, Expert Witness Testimony

At trial, Defendants called James Filkins, a Medical Examiner with the Cook County Medical Examiner's Office, as a witness. Defendants then laid the foundation regarding the autopsy report of Elrod (Defendants' Ex. 20) and sought to admit the exhibit as a public record. (Trial Tr. 946:10 – 946:25, Feb. 7, 2012.) Defendants then sought to elicit testimony from Filkins regarding the autopsy reports of the decedents, though Filkins was not involved in the autopsy or the preparation of the reports. However, because Defendants failed to disclose him as an expert witness pursuant to Fed. R. Civ. P. 26(a)(2), Filkins could not be permitted to provide expert testimony.

The Court ruled it would admit the autopsy reports into evidence pursuant to Federal Rule of Evidence 803(8). (Trial Tr. 955:2 – 955:4, Feb. 7, 2012.) Defendants, apparently relying on off-the-record exchanges between Defendants' counsel and Plaintiff's counsel prior to trial, now claim in their motion that Filkins was "timely disclosed prior to trial" and that Plaintiff had waived any objection to Filkins' testimony. (Defs.' Mot. at 13.) Plaintiff counters, however, that she had agreed only to allow someone other than the person who performed the autopsy to testify to lay foundation for

13

the report.[7] (Pl.'s Resp. at 11-12; Trial Tr. 948:9 – 949:11, Feb. 7, 2012.) Defendants

argue that because they were unable to have Filkins testify beyond laying a foundation

for the autopsy reports, they were "profoundly prejudiced." (Defs.' Mot. at 14.)

The Court addressed the prejudice permitting Filkins' testimony would cause:

> THE COURT: . . . If he's just going to read the [autopsy] report verbatim, that might be a legitimate way of publishing. But if he's going to elaborate on the report, that's not fair.
>
> The better way is if you want to offer the report, you've qualified it as a business record - - pardon me, as a public record. If you want to offer the report and it contains material in there that would violate the motion *in limine*, redact it.
>
> MR. MARSH: We are happy to redact it.
>
> THE COURT: Okay. But the report itself is the evidence now. He can't opine on what the report means.
>
> So you can put the report in for whatever that's worth. But you can't have him testifying effectively from the report, drawing conclusions from it, because Mr. Kulis is right,

---

[7] Defendants argue that Plaintiff knew Defendants sought to elicit Filkins' testimony as an expert and that Plaintiff waived her objection to Filkins' testimony. However, the email submitted in support of this argument, sent from Defense Counsel Jordan Marsh to Plaintiff's counsel, merely indicates that per their discussions, Plaintiff withdrew her "objection to a witness from the Medical Examiner's office to testify regarding the autopsy reports," without providing a basis for the objection. (Defs.' Mot., Ex. D.) Even Defendants acknowledge in their motion that "the precise nature and basis of Plaintiff's objection was unclear . . . ." (Defs.' Mot. at 12 n.6.) Plaintiff responded that she was not objecting to having a "substitute" medical examiner testify to lay foundation for the medical reports. (Pl.'s Resp. at 13.) Attorney Kulis, for Plaintiff, further indicated at sidebar that Plaintiff believed Filkins would be providing only foundational testimony, stating: "I said [Filkins] could testify, but I didn't know what he was going to – I thought he was going to testify – if he's just going to ask him to submit the report, that's one thing." (Trial Tr. 949:6 – 949:9, Feb. 7, 2012.) Nothing presented by Defendants contradicts Plaintiff's assertion that Plaintiff agreed to a new medical expert only for purposes of laying the foundation necessary to admit the medical report.

14

that would be unfair, he can't cross-examine him on that.

(Trial Tr. 954:9 – 954:24, Feb. 7, 2012.) Filkins was called as the last witness in the trial. Defendants sought to have Filkins provide *expert* testimony, beyond the foundational testimony required to introduce the autopsy reports into evidence. Plaintiff had no opportunity to effectively prepare cross-examination as provided by the rules. Moreover, Defendants had ample opportunity to disclose Filkins as an expert witness prior to trial. Defendants, as will be discussed below, after causing the report to be admitted, withdrew the report from evidence before it was published to the jury.

Defendants were not unfairly prejudiced by the exclusion of Filkins' testimony.[8] Had the Court permitted Filkins to testify, despite the fact that he was not disclosed as an expert witness, such undisclosed, expert testimony *would* be grounds for a new trial. *See Tribble v. Evangelides*, 670 F.3d 753, 759-60 (7th Cir. 2012). The Court was obligated to exclude the undisclosed, expert testimony of Filkins in order to prevent Plaintiff from being unfairly prejudiced. This ruling did not result in unfair prejudice against Defendants; rather, Defendants, at best, were surprised that they were not permitted to disregard a rule of evidence or civil procedure. Therefore, Defendants' motion for a new trial on this basis is denied.

### Plaintiff's Closing Argument

Yerke also requests a new trial on the excessive force claim against him, arguing Plaintiff's closing argument substantially prejudiced Yerke. Specifically, Yerke alleges

---

[8] As will be discussed below, Defendants never specifically disclosed to the Court, at that time, exactly what testimony Filkins would offer that was excluded by the Court's ruling. *See* Fed. R. Evid. 103(a)(2).

he was prejudiced because Plaintiff's counsel was permitted, despite Defendants' objections, to "(1) shift the burden of proof to the defendant; (2) make statements not based on evidence introduced at trial; and (3) draw unreasonable inferences from the facts that amount to nothing more than sheer speculation." (Defs.' Mot. at. 16.)

The Seventh Circuit has held repeatedly that "improper comments during closing argument rarely rise to the level of reversible error." *Williams v. Calderon*, 52 F.3d 1448, 1465 (7th Cir. 1995) (quoting *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989)). "Attorneys have more leeway in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize the strengths in their own case." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008) (*Soltys*). In particular, Defendants argue Plaintiff's counsel made statements during the closing argument that implied the Chicago Police Department failed to properly collect evidence at the scene of the shooting. Defendants argue Plaintiff's counsel made statements during closing argument that improperly characterized evidence and gave the jury the impression the burden of proof was on Defendants. Defendants allege Attorney Kulis's contention during the closing argument that decedent Elrod was running away while Yerke continued to shoot at him was not a "permissible, reasonable inference." (Defs.' Mot. at 17.) While Yerke's testimony is to the contrary, as discussed above, the totality of the evidence including: the number of shots fired; the locations of the decedents' unfired weapons; the positioning of Elrod's body; and, particularly, the gunshot entrance wound to the head all might support the inference argued by Plaintiff. In closing argument, Plaintiff's counsel may suggest inferences regarding the evidence and

characterize the evidence in a way that supports Plaintiff's case. None of the statements

made by Plaintiff during closing argument raised in Defendants' motion created a

prejudice, requiring the granting of a new trial.

At the close of the evidence, before closing arguments, the Court instructed the

jury as follows:

> THE COURT: I caution you now that what the lawyers say during their final argument must be based on facts that are in evidence and inferences that are reasonably drawn from the facts that are in evidence.
>
> To the extent that the lawyers' comments are not supported by the evidence or reasonable inferences, you should disregard them.
>
> Do you understand that?
>
> (Jurors indicating.)

(Trial Tr. 958:18 – 959:7, Feb. 7, 2012.) After the first objection from defense counsel

during Attorney Kulis's closing argument, the Court again addressed the jury regarding

the context of closing arguments.

> MR. MARSH: Objection to burden shifting, your Honor.
>
> THE COURT: Overruled.
>
> Ladies and gentlemen, at the conclusion of all the evidence, you will be instructed on the law to be applied in this case and you must apply the law as I instruct you.
>
> Will you do that?
>
> (Jurors indicating.)
>
> THE COURT: Likewise, as I told you earlier, the attorneys' comments are not in and of themselves evidence, and to the extent that comments made by either side here disagree with your recollection of the evidence, you should

disregard those comments.

Do you understand that as well?

(Jurors indicating.)

THE COURT: Very well.

Proceed, Mr. Kulis.

(Trial Tr. 965:21 – 966:12, Feb. 7, 2012.) Attorney Marsh, representing Defendants,

objected five additional times thereafter during Attorney Kulis's closing argument. After

the sixth objection, the Court again addressed counsel and the jury, clarifying what

statements were permissible in a closing argument.

> THE COURT: Hold it a second.
>
> (Reading:) Counsel may discuss facts proved or admitted.
> Generally the arguments must be confined to the issues of
> the case on trial and must be fair and reasonable deductions
> therefrom.
>
> However, it is proper for counsel to state his views of the
> evidence and to state various inferences and conclusions
> which he believes the jury should draw from the testimony.
> . . . He may also make reference to those matters of
> common knowledge which may be judicially noted.
>
> Those objections are overruled. And I'm citing from 70.1
> of Hunter's Federal Trial Handbook for Lawyers, Civil
> Edition.
>
> Proceed.

(Trial Tr. 979:19 – 980:8, Feb. 7, 2012.) Attorney Marsh's eight objections were

overruled because Attorney Kulis was stating his views of the evidence and the various

inferences the jury might draw based on the evidence presented at trial. Attorney Kulis's

closing argument was not improper or prejudicial.

Moreover, the Seventh Circuit has found that "curative instructions to the jury mitigate harm that may otherwise have resulted from improper comments during closing argument." *Soltys*, 520 F.3d at 745. Besides the instructions given to the jury immediately *before* and *during* the closing argument, the jury also received an instruction subsequent to the closing arguments, providing:

> [Q]uestions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from [the Court's] rulings that [the Court] ha[s] any view as to how you should decide the case.
>
> . . . [T]he lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

(Jury Instruction No. 4.) Therefore, even if any statements made during Plaintiff's closing argument were improper, their impropriety was cured by the numerous instructions the jury received from the Court that the attorneys' statements were not evidence. *See Soltys*, 520 F.3d at 745 ("The judge twice instructed the jury that attorney statements did not constitute evidence; we presume that the jury obeyed the court.") (citing *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007)). Therefore, Defendants' motion for a new trial on the basis of Attorney Kulis's closing argument being unfairly prejudicial to Defendants is denied, as Defendants failed to demonstrate the existence of a reversible error.

### Verdict Against the Manifest Weight of the Evidence

Yerke submits that his argument for judgment as a matter of law also "demonstrates that Plaintiff produced no evidence supporting her argument that Officer Yerke's use of deadly force was objectively unreasonable," and therefore also warrants the granting of a new trial. (Defs.' Mot. at 20.) However, as explained above, the jury made permissible, reasonable inferences in its evaluation of the evidence and rendered a verdict based on this evidence. And, as discussed above, the jury's verdict was not contrary to the manifest weight of the evidence. Therefore, Defendants are not entitled to a new trial on this ground.

### Claim Against Pinal

Finally, Pinal also moves for a new trial on the excessive force claim against Pinal, arguing again that the barring of a medical examiner's testimony prejudiced him. In particular, Defendants allege they were unfairly prejudiced by the fact that Medical Examiner Filkins was prohibited from providing expert testimony because he had not previously been disclosed as an expert witness. Defendants argue, for the first time in their post-trial motion, Filkins' testimony would have explained to the jury that according to the autopsy report, decedent Elrod did not suffer any injuries to his mouth, lips, or teeth, and did not have a broken nose.[9] (Defs.' Mot. at 21.) Therefore, Pinal argues, the

---

[9] As discussed above, Defendants first caused the report (Defs.' Ex. 20) to be admitted into evidence as a public record and then moved to withdraw it from evidence. Defendants do not explain why they did not keep the report in evidence and direct the jury to consider that the 3 pages under the heading "Evidence of Injury" contains no statements of any facial injuries on the body of Kenneth Elrod. Nor do Defendants explain why it would have been necessary to have Filkins testify to convey this fact (obvious from the face of the report) to the jury.

jury would have found that the force used by Pinal against decedent Elrod in the bar was
*not* excessive.

However, the Court would not permit a previously undisclosed, expert witness to
provide expert testimony. Defendants could have easily prevented the exclusion of this
testimony by properly disclosing Filkins as an expert witness. Defendants could have
also submitted the autopsy reports into evidence for the jury to consider. Their decision
to exclude these reports from evidence was part of their trial strategy, not an error
committed by the Court.[10] Thus, Defendants' motion for a new trial as to the excessive

---

[10] Defendants now submit that the "'through and through' wounds, as included in
the autopsy reports, would have been crucial to the jury's consideration of the shooting
claim." (Defs.' Reply at 11.) However, Defendants withdrew the autopsy report from
evidence, because without Filkins' testimony to discuss the report, Defendants feared the
reports "could be misinterpreted by Plaintiff's counsel and . . . [the] jury." (Defs.' Mot.
at 13.) As mentioned above, at no time *during the trial* did Defendants ever set out what
Filkins would have said in this regard either as an offer of proof or otherwise. *See* Fed.
R. Evid. 103(a)(2), providing: "A party may claim error in a ruling to admit or exclude
evidence only if the error affects a substantial right of the party and . . . if the ruling
excludes evidence, a party informs the court of its substance by an offer of proof, unless
the substance was apparent from the context." Defendants' counsel apparently decided
against admitting a report (which contained crucial evidence) and then objecting to any
improper argument made about it by Plaintiff's counsel.

> THE COURT: Jordan, you're moving to withdraw
> Defendants' Exhibits 19 and 20?
> MR. MARSH: We are, your Honor.
> THE COURT: Any objection?
> MR. KULIS: No, your Honor.
> THE COURT: Very well. Those are withdrawn.
> MR. KULIS: Are you going to announce that for the jury,
> your Honor?
> THE COURT: They haven't seen them.
> MR. KULIS: They were offered into evidence in front of
> them.
> . . .
> THE COURT: So you're withdrawing – you want them
> instructed not to consider something they haven't seen?

force claim against Pinal is denied, as the Court's ruling regarding undisclosed, expert testimony was proper.

## CONCLUSION

Based on the foregoing analysis, Defendants' Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial is denied.

Date: 8-24-12

JOHN W. DARRAH
United States District Court Judge

_____

MR. MARSH: *I think the less said is better.*
THE COURT: I agree.

(Trial Tr. 962:1 – 962:17, Feb. 7, 2012) (emphasis added). Despite Defendants' view at trial that the less said about the autopsy reports, the better, Defendants now argue "the court refused . . . to explain [the withdrawal of the autopsy reports] to the jury, which was consequently left with the impression that the Defendants were attempting to hide evidence." (Defs.' Mot. at 15.) This assertion is completely contrary to the record.